UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ANTHONY CLAY,                           )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )          2:05-cv-27-WGH-RLY
                                        )
SCHWAN'S HOME SERVICE, INC.,            )
                                        )
                    Defendant.          )


**ENTRY ON DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**


**I.   Introduction**

This matter is before the court on defendant Schwan's Home Service, Inc.'s

Motion for Summary Judgment filed May 1, 2006.[1]  (Docket Nos. 48-51).  Plaintiff

filed his Brief in Response on June 1, 2006.  (Docket Nos. 52-54).  Defendant's

Reply Brief was filed on June 22, 2006.  (Docket Nos. 57-58).


**II.   Factual and Procedural Background**

The facts, as set forth in the parties' pleadings and viewed in the light most

favorable to plaintiff, are as follows.

---

[1]The parties consented to Magistrate Judge jurisdiction in this case in their
Case Management Plan filed June 23, 2005 (Docket No. 23) and by filing their written
Consent to Magistrate Judge jurisdiction on June 28, 2005 (Docket No. 29).  District
Judge Richard L. Young entered an Order of Reference on June 28, 2005.  (Docket No.
28).

Defendant hired plaintiff, an African American male, on January 20, 1997, as a route manager. (Deposition of Anthony Clay ("Clay Dep.") 29). As route manager, plaintiff was responsible for visiting existing customers and developing new ones on his assigned route. (*Id.* 35). In December of 2001, defendant promoted plaintiff to the position of sales manager for the "depot" based in Terre Haute, Indiana.[2] (*Id.* 60-61). As sales manager, plaintiff was responsible for hiring, firing and managing approximately ten route sales managers and for developing new customers within his geographic area of responsibility. (*Id.* 67). Upon being hired as sales manger at the Terre Haute depot, plaintiff's division manager was Gerry Sinclair ("Sinclair"). (*Id.* 50-51).

**(a)    Early Incidence of Alleged Racism**

Prior to promotion to his sales manager position in Terre Haute, plaintiff was riding with Sinclair through a predominately African American neighborhood on his Illinois route when Sinclair told plaintiff that he was very concerned about plaintiff fitting in in Indiana. (Clay Dep. 54-55). Defendant's managers, including Ed Birkle and Ron Cannon, told plaintiff that Sinclair had mentioned his concern about plaintiff fitting in because he was black and his wife was white. (Clay Dep. 55-57, 171-72). Also, when plaintiff arrived in Terre Haute, all sales managers in his district had to put out a newsletter, with each depot giving itself a war-themed name. (Clay Dep. 171-73). The newsletter for the Terre Haute depot was the *Rebel*

---

[2]Plaintiff was the only African American manager in defendant's entire Great Lakes Region (which included Indiana, Illinois, Wisconsin and Michigan). (Cardoni Dep. 30, 32). All of plaintiff's counterparts were Caucasian. (Leiker Dep. 37).

*Yell*.  Clay was offended and thought the *Rebel Yell* was discriminatory.  (*Id*.) Clay

changed the depot's nickname to *Titans*.  (*Id*. 173).  Sinclair did not like the change

and pressured Clay to return to a Confederate nickname. (*Id*.)

**(b)      A Change in Supervisors**

In January of 2002, Gary Leiker (Leiker") took over the position of division

manager for the Great Lakes Region and became plaintiff's supervisor.  (Affidavit of

Gary Leiker ("Leiker Aff.") ¶ 4; Clay Dep. 7).  Leiker's office was located in

Greenwood, Indiana.  (Leiker Aff. ¶ 11).

At the time plaintiff was initially promoted to the sales manager position, he

was responsible for all aspects of the Terre Haute depot, including the warehouse

or distribution functions.  The distribution side involved maintenance of the trucks

used by the route managers and also ensuring that each truck was adequately

stocked with products before the route manager began his or her route.  (Clay Dep.

71).  About one year after plaintiff became a sales manager, the company

restructured its operations and separated the sales and distribution functions at

each depot.  (*Id*. 71-72).  As a result of this restructuring, plaintiff retained his

responsibilities for the sales function but defendant assigned another employee,

David Kennedy ("Kennedy"), to be responsible for the separate distribution

function.  (*Id*. 71-73).  Kennedy reported to Jeff Kirchhoff ("Kirchhoff"), the district

operations manager for the Great Lakes Region.  (Affidavit of Jeff Kirchhoff

("Kirchhoff Aff.") ¶ 2; Clay Dep. 73).

Because the sales and distribution functions at each depot were interdependent, any problems with one of those functions could affect the other side's ability to function effectively.  (Clay Dep. 137-40).  In early 2003, plaintiff frequently complained to Leiker that Kennedy's crew was not meeting its distribution obligations and that this hurt the performance of plaintiff's sales force.  (*Id.* 137-39).

Although the performance of defendant's sales managers was measured in part by the level of sales achieved by the route managers they supervised, other factors – including ability to work as a team and ability to effectively interact with other employees and members of management – also were critically important for any employee holding a sales management position.  (Leiker Aff. ¶ 4).

**(c)      Plaintiff's First Complaint of Race-Related Remarks:  Dana Hinrichs**

Plaintiff claims that in 2002[3] he reported to Schwan's management that he had been told by three of his employees that an employee named Dana Hinrichs ("Hinrichs"), who had left Indiana to take a position in Louisiana but was visiting the Terre Haute depot, had remarked to them that he did not like Louisiana because there are too many poor areas and too many blacks.  (Amended Complaint ¶ 6; Clay Dep. 178-81).  Plaintiff was not present when this remark was made.  (Clay Dep. 179).  Defendant's records indicate that Hinrichs had been disciplined

---

[3]In plaintiff's deposition, he testified that he made the complaint regarding this allegation "probably a couple of months after I had started as a sales manager. . . ." (Clay Dep. 230).  Plaintiff started as a sales manager in January 2002, but documents provided by plaintiff suggest that Hinrichs was terminated in March 2001.  (*See* Plaintiff's Response to Motion for Summary Judgment at Exh. 8).

several times prior to plaintiff's complaint for "similar incidents" and "like situations." (Deposition of Roger Cardoni ("Cardoni Dep.") Exh. 8). Upon receiving plaintiff's report that Hinrichs had made such a comment, management investigated the matter and eventually terminated Hinrichs. (*Id.* 180-81).

**(d)      The September 2002 Incident**

On September 24, 2002, Leiker alleges that he met with plaintiff at the Terre Haute depot to discuss plaintiff's duties as a sales manager. (Leiker Aff. ¶ 6). A "heated conversation" ensued in which Leiker threatened plaintiff saying plaintiff "didn't know who he was messing with" and plaintiff also "probably" told Leiker that he "didn't know who he was messing with." (Clay Dep. 134). Leiker alleges that, during this meeting, plaintiff became agitated and began slamming doors and yelling at Leiker, who was plaintiff's supervisor at the time. (Leiker Aff. ¶ 6). Leiker alleges that he responded by asking plaintiff to leave the depot and to return later once he had cooled down.[4] (Leiker Aff. ¶ 7). Leiker claims that he immediately drafted a memorandum documenting this alleged confrontation with plaintiff. (Leiker Aff. ¶ 8, Exh. A). However, of the ten Corrective Action Reports that Leiker issued to plaintiff, each of which was filed after this alleged incident, none make any mention of any argument or "incident" between plaintiff and Leiker. (*See e.g.* Leiker Dep. Exh. 1; Clay Dep. Exhs. G, R). And, plaintiff's February 2003

---

[4]Nothing in the record suggests that racial epithets or other language was used in this confrontation, or that the subject matter addressed anything except disputes over how "job duties" were to be performed.

employee evaluation from Leiker also makes absolutely no mention of a September 2002 "incident."  (Clay Dep. Exh. V).

**(e)     Plaintiff's 2003 Evaluation**

In February of 2003, Leiker evaluated plaintiff.  (*Id.* ¶ 9).  The evaluation form required Leiker to give plaintiff an overall rating on a scale of one to five, with one being the lowest (Unsatisfactory) and five being the highest (Consistently Exceeds Expectations).  Leiker assigned plaintiff an overall rating of two (indicating that he "Partially Meets Expectations").  (Leiker Aff. ¶ 9 Exh. B).

**(f)     Plaintiff's Second Complaint of Race-Related Remarks:  Keith Luettejohann**

Plaintiff next reported to management that two of his subordinates returned from training in Highland, Illinois in February of 2003 and told plaintiff that Keith Luettejohann ("Luettejohann"), who was the individual conducting the training, had commented that plaintiff "did not know what he was doing" and later remarked that the town of Highland was very affluent, the residents "don't put up with blacks being here past dark," and that "the Klan is huge here."  (Clay Dep. 91-93).  Plaintiff first took his complaints about these remarks to Leiker, but Leiker did not help him, and when plaintiff asked what to do, Leiker had no answer. (Clay Dep. 94).  Plaintiff instead made his report to Roger Cardoni ("Cardoni"), the human resources manager for the Great Lakes Region, and sent Leiker a copy. (Clay Dep. Exh. U).  The complaint was allegedly investigated and handled by Cardoni.  (Cardoni Dep. 40-41).  Cardoni claims that he gave Luettejohann a final

written warning as a result of this incident.[5]  (*Id.* 41).  However, the entirety of Luettejohann's personnel records produced by defendant contain no record of discipline for the racist statements, nor does the file contain any record of any investigation.  (Affidavit of Robert Kondras ("Kondras Aff.") ¶ 7).

**(g)**     **Plaintiff's Achievement of Sales Goals in Late 2002 and Early 2003**

Plaintiff has brought forward evidence that he met his sales goals and at least, in part, performed as could reasonably be expected by his employer during the time period immediately before his termination.  (See Exhibits 11 and 12, 2002 and 2003 Sales Manager Bonus Calculations).

**(h)**     **The May 19, 2003 Incident**

Plaintiff was asked to attend a meeting[6] at Leiker's office on May 19, 2003.  (Leiker Aff. ¶ 10).  The purpose of this meeting was to talk about problems within the warehouse (Clay Dep. 206-07; Clay Dep. Exh. CC), and to discuss and resolve the circumstances surrounding an investigation that plaintiff was conducting into an alleged romantic relationship between a male distribution employee supervised by Kennedy and a female sales employee supervised by

---

[5]Defendant claims a zero tolerance policy against race discrimination as indicated on page 22 of the Schwan's Employee Handbook (Cardoni Dep. 19-20), and anyone found to violate that policy would allegedly be terminated (Cardoni Dep. 20). Defendant also has a procedure to stay in touch with employees who complain of discrimination.  (Cardoni Dep. 25).  However, with Clay's discrimination complaint against Luettejohann, Cardoni did not follow up.  (Cardoni Dep. 42-43).

[6]The individuals who attended this meeting included plaintiff, Leiker, Kennedy, Kirchhoff, and Leiker's administrative assistant, Juanita Lowman ("Lowman").  (Leiker Aff. ¶ 11).  Cardoni participated by telephone.  (Affidavit of Roger Cardoni ("Cardoni Aff.") ¶ 5).

plaintiff.  (Leiker Aff. ¶ 10).[7]  Defendant alleges that Kennedy approached his

supervisor, Kirchhoff, to set up the meeting because Kennedy and others believed

that plaintiff's investigation was not sufficiently discreet or professional.  (Leiker

Aff. ¶ 10).  The reasons for calling the meeting are not disputed.  However, as might

be expected in a lawsuit, there are two versions of what occurred once the meeting

started.  The plaintiff's version includes these facts:

> Clay was told to attend a meeting to discuss conflicting stories
> about Chris Wright and Merry Shepard and to talk about problems
> with the warehouse.  (Clay Depo., pp. 206-207; Exh. CC)  Those issues
> were not talked about.  (Clay Depo., p. 207)  Instead, the other persons
> present, particularly David Kennedy and Jeff Kirchoff, accused Clay of
> making up a story that Chris Wright and Merry Shepard were having
> an affair.  (Clay Depo., pp. 207-208).  Mr. Kirchoff ran the meeting and
> "exploded."  (Clay Depo., p. 208)  Kirchoff and Kennedy were telling lies
> about Clay in this meeting.  (Clay Depo., p. 210)  Clay testified that the
> meeting was a set up.  (Clay Depo., p. 210)  Clay, Kennedy and
> Kirchoff had words.  (Clay Depo., p. 210)  Those conducting the
> meeting would not let Clay tell his side of the story.  (Clay Depo., p.
> 211)  An argument between Clay and David Kennedy became heated.
> (Clay Depo., pp. 209-212, 215)  Mr. Kennedy and Clay had to be
> separated.  Gary Leiker, a 6'4" man, separated Kennedy from the
> argument.  (Leiker Depo., p. 174-176), while Juanita Lowman, an
> "average size lady," escorted Clay outside.  Id.

(Plaintiff's Brief in Response, p. 5).

According to defendant, plaintiff was very defensive during the discussions

and, in response to questions posed by Kirchhoff and Cardoni about the

---

[7]Plaintiff had received a report from an employee at a Terre Haute Knight's Inn
that one of defendant's delivery trucks was seen at the hotel during the day from
10:00 a.m. until noon.  (Clay Dep. Exh. DD).  Clay documented the report and what he
knew about the warehouse employees named Chris Wright ("Wright") and Merry
"Krissy" Shepard ("Shepard") and sent the report to his supervisor, Gary Leiker.  (Clay
Dep. 205, Exh. DD).  Prior to sending the report to Leiker, plaintiff had tried to look
into the situation by consulting Kennedy.  (Clay Dep. 205).

investigation, plaintiff became furious and got out of his chair and began yelling. (Leiker Aff. ¶ 12).  According to defendant, plaintiff clinched his fists, glared at Kirchhoff, and leaned forward in a threatening manner.  (Leiker Aff. ¶ 12; Kirchhoff Aff. ¶ 11; Affidavit of Juanita Lowman ("Lowman Aff.") ¶¶ 6, 8).  Defendant alleges that all others in the meeting, including Kirchhoff and Kennedy, remained calm and in control.  (Leiker Aff. ¶¶ 13,14; Lowman Aff. ¶ 9).  As a result of this behavior, Leiker asked plaintiff to leave the room because of his concern that plaintiff might hurt someone.  (Leiker Aff. ¶ 15).  Kennedy also was asked to leave because Leiker wanted to discuss plaintiff's behavior with input from Cardoni and the other members of upper management who had just witnessed the incident. (Leiker Aff. ¶¶ 15,16; Cardoni Aff. ¶ 8).  On his way out of the room, plaintiff warned Kennedy not to come near him.  (Leiker Aff. ¶ 15; Cardoni Aff. ¶ 9). Plaintiff was then asked to return to the meeting room, and Leiker informed plaintiff that he was being placed on administrative leave until Leiker made a final decision as to the appropriate consequences for plaintiff's behavior.  (Leiker Aff. ¶ 17).

Plaintiff was eventually discharged, and it was his belief that he was being terminated for his openness about the alleged affair.  (Clay Dep. 218).  In fact, defendant provided plaintiff with three different documents explaining his termination, each of which stressed that plaintiff was terminated for unsatisfactory performance.  (Leiker Dep. Exh. 10; Clay Dep. Exhs. FF, GG).  None of these three different written explanations make any mention of an "incident" or "outburst" or

any "behavior" that led to the termination decision.  (Leiker Dep. Exh.10; Clay Dep.

Exhs. FF, GG).[8]  Defendant claims that Leiker ultimately decided to discharge

plaintiff as a result of this incident and the discharge became effective May 23,

2003.  (Leiker Aff. ¶ 18).

**(i)   Applicable Sections of Employee Handbook**

The Standards of Conduct section of defendant's employee handbook

provides:

> By accepting a position of employment with Schwan's, you
> acknowledge that you have a responsibility to conduct yourself in
> accordance with Schwan's Standards of Conduct (the "Rules").  The
> following guidelines outline Schwan's expectations regarding your
> conduct.
>
> * * * * *
>
> In addition to the Standards of Conduct set forth in this handbook,
> you are also expected to comply with rules of conduct established in
> the department, division, office, depot, work area, etc. which you are
> assigned to and to follow common sense standards of acceptable
> employee behavior.
> 1. General
> These basic rules are not an all-inclusive list.  You are expected to use
> good judgment and common sense and to comply with rules of
> conduct which are commonly accepted in a working environment.  You
> must also comply with specific Company regulations that apply to your
> job.
> Rule infractions will be dealt with according to the seriousness of the
> offense, and violators will be subject to appropriate disciplinary action
> up to and including discharge.  Some acts of misconduct, even if
> committed for the first time, are so serious that, standing alone, they
> justify immediate discharge.  Some examples of these offenses are
> violations of rules regarding: . . . insubordination, dishonesty, fighting
> or other acts of violence, . . . threatening, intimidating or interfering
> with other employees. . . .

---

[8]This is true despite the fact that defendant had several specific "Reason Codes"
that were applicable including:  (1) misconduct (Code 20); (2) violation of a company
policy (Code 44); and (3) refusal to follow instructions (insubordination) (Code 46).
(Leiker Dep. Exh. 10).

(Employee handbook at 10-11; *see also* Cardoni Aff. ¶ 12-13).  The Standards of Conduct section of the handbook also expressly prohibits insubordination, abusive language, and "[h]arassing, threatening, intimidating, assaulting, fighting or provoking a fight or similar interference with other employees at any time, on or off duty." (Employee handbook at 13-14, 18; Cardoni Aff. ¶12, Exh. 1).

**(j)     The Aftermath of Plaintiff's Termination**

After his termination plaintiff filed an Amended Complaint on March 11, 2005, asserting that he was treated in a disparate manner in the terms, conditions, and privileges of his employment, that he was discriminatorily disciplined and terminated, and that he was retaliated against because he complained of discriminatory treatment, all in violation of 42 U.S.C. § 1981.  (Amended Complaint ¶¶ 18-24).

Defendant seeks summary judgment on all of plaintiff's claims.  Specifically, defendant argues that plaintiff cannot demonstrate a prima facie case on his retaliation or discrimination claims.  The court agrees that plaintiff has failed to bring forward sufficient evidence to create doubt about the defendant's motivation for the termination and, therefore, concludes that defendant is entitled to judgment as a matter of law on all of plaintiff's claims.

### III.   Legal Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled

to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor.  *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## IV.   Analysis

Plaintiff brought his claims of discrimination and retaliation under 42 U.S.C. § 1981.  Section 1981 prohibits racial discrimination in the making and enforcing of contracts.  *Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799, 806 (7th Cir.

1999).[9]  In most aspects, a Title VII claim and a § 1981 claim are analyzed in the same manner.  *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168, 176 (7th Cir. 1996).

**(a)     Plaintiff's Claims of Discrimination**

Under Title VII and § 1981, a plaintiff attempting to demonstrate discrimination may do so by showing direct or indirect evidence of discrimination. *Vakharia,* 190 F.3d at 806.

### (1)     Has the plaintiff brought forward "direct evidence" of discrimination?

Direct evidence of discrimination is "evidence which can be interpreted as an acknowledgment of the defendant's discriminatory intent."  *Ezell v. Potter,* 400 F.3d 1041, 1051 (7th Cir. 2005).  Plaintiff argues that he has direct evidence of discrimination.  However, plaintiff has not directed the court to any evidence that suggests an acknowledgment by Leiker of a discriminatory intent.[10]

Plaintiff does argue that he presents "direct" evidence of discriminatory intent by producing a "convincing mosaic of circumstantial evidence," citing to the case of *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection,* 344 F.3d 680, 689 (7th Cir. 2003), which he represents as quoting from *Plair v. E.J.*

---

[9]Section 1981 explains that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . includ[ing] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(a) & (b).

[10]At page 15 of his brief, plaintiff acknowledges that he does not have "direct evidence (in the form of an admission) that Schwan's terminated him because he is African American.

*Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997).  This Magistrate Judge admits to some uncertainty as to when and how to apply this more recently argued test.  *Plair* describes when direct evidence exists in the following language:

> Plair offers no direct evidence of alleged racial animus.  In this circuit, "direct evidence" is defined as evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications,* 876 F.2d 563, 569 (7th Cir.1989).  Here, direct evidence would be what Brach and its employees said or did *in the specific employment decision in question:  terminating Plair.*  Plair does not contend that Klepper ever said he discharged Plair because he is black.  Nor is there any claim Klepper ever referred to blacks in racially derogatory terms.  Plair admits that no manager or supervisor at Brach said anything to him that was "racially insulting, hostile, or derogatory," during his termination or ever.

*Id.* at 347 (emphasis added).

*Plair* therefore seems to confine "direct evidence" to what the employer and its employees did in the time period or events involved in the *specific decision to terminate the plaintiff's employment.*  From this language, the Magistrate Judge believes that direct evidence of discriminatory motive may exist in a termination decision even when the decision maker does not use explicitly discriminatory language to announce the decision.  Circumstances surrounding the employment decision – such as suspicious timing – may be enough to show that there is discriminatory animus without use of explicit language.  However, the *Plair* language leads the Magistrate Judge to believe that not everything that ever happened to a plaintiff since the inception of his or her employment can be said to be "circumstantial" evidence showing intent at the moment of the termination decision.  *Plair* requires that to be direct – albeit circumstantial – evidence, the

circumstances must be reasonably close in time and reasonably related to the articulated reason for the termination to cast doubt upon that particular incident or named cause.  Simply put, the "circumstantial" evidence cannot be too far removed from the decision date to remain direct evidence.

*Volovsek* does broaden the description of "direct" evidence to include "circumstantial evidence" in this language:

> Volovsek can prove intentional sex discrimination and retaliation directly or indirectly.  The direct method may employ either of two types of evidence:  direct evidence and circumstantial evidence.  The inevitable confusion of using the word "direct" to mean two different things aside, direct evidence is evidence, which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption."  *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997) (internal quotation omitted).  This evidence of the I-am-not-promoting-you-because-you-are-a-woman type is understandably rare.  There is no evidence of this kind in the present case.  The more common type of evidence is circumstantial evidence that allows a jury to infer intentional discrimination or retaliation.  *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003).

> Circumstantial evidence comes generally in three flavors:  (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the employee was qualified for the promotion and passed over and the employer's reason for the difference in treatment is a pretext for discrimination.  *Troupe v. May Dep't Stores,* 20 F.3d 734, 736 (7th Cir. 1994).  The third category bears an eerie similarity to the evidence required under the indirect method.  *See Huff v. UARCO Inc.,* 122 F.3d 374, 380 (7th Cir. 1997).

*Id.* at 589-90.

When this court reads these two cases together, it concludes that for the plaintiff to present "direct evidence" of discrimination by "mosaic," the plaintiff's

proof must be more closely limited to the *specific employment decision* (here, termination) and not to the way a plaintiff was treated generally during his or her entire employment tenure.  Therefore, to be "direct evidence" of intentional discrimination when there is no "admission" of discriminatory motive, the court must find that circumstances surrounding the specific decision to terminate occurred close enough in time to the decision that they give texture to the particular decision made even though the decision maker did not use explicitly discriminatory language in announcing the decision to terminate.

The instances of conduct brought forward by the plaintiff here as "direct" evidence occurred during the plaintiff's employment tenure, but did not occur close enough in time to the termination decision to give texture to the specific incident leading to the decision to terminate the plaintiff.  Plaintiff suggests that at a meeting at the beginning of his tenure, his prior manager, Gary Sinclair, met with Clay's fellow sales managers, all Caucasians, and asked them if they thought they could work with a black manger who had a white wife.  (Plaintiff's Brief in Response, p. 16).  This incident, involving a different manager (Sinclair) and a significantly different time period (2001), does not constitute a circumstance sufficiently close to the decision to terminate plaintiff (by a different manager – Leiker) to give texture to the specific decision to terminate the plaintiff arising out of the incident which occurred May 19, 2003.  Likewise, the incidents concerning the *Rebel Yell*, the comments made by Hinrichs in 2001 (who was later terminated for those remarks), hostile e-mails, and racially derogatory comments allegedly

made by another district manager from a different district whom plaintiff had never met are all incidents that occurred too far away in time to be "circumstances" surrounding the May 19, 2003 incident to constitute facts that amount to "direct" evidence material to the decision to terminate the plaintiff.

These facts could be material to the indirect method of proving discrimination which will be discussed later in this opinion. However, the court concludes that to be "direct – albeit circumstantial" evidence material to a decision to terminate, that evidence must occur reasonably close in time and must arise from the context of the incident immediately preceding the termination decision. The plaintiff's evidence here is not direct evidence of discrimination.

**(2)      Plaintiff's Indirect Evidence of Discrimination**

Because plaintiff has been unsuccessful in demonstrating direct evidence of discrimination, the court must search for indirect evidence of discrimination by examining plaintiff's claim using the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, an employee must first establish a prima facie case of discrimination. *Pafford v. Herman,* 148 F.3d 658, 665 (7th Cir. 1998). Once the employee has carried his burden of demonstrating a prima facie case, there is a presumption of discrimination, and the burden shifts to the employer who must articulate a legitimate, nondiscriminatory reason for the action. *Id.* If the employer provides such a reason, the burden then shifts back to the employee

to prove that the employer's stated reason is a mere pretext.[11]  *Vakharia,* 190 F.3d at 806-07.

In order to demonstrate a prima facie case of discrimination plaintiff must show that:  (1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he suffered a materially adverse employment action; and (4) his employer treated similarly situated employees outside the protected class more favorably.  *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1132 (7th Cir. 1994).  Failure to establish any of these four elements defeats a discrimination claim.  *Bio v. Federal Express Corp.,* 424 F.3d 593, 596 (7th Cir. 2005).

Plaintiff has essentially raised two instances of discrimination – he alleges discrimination in the way of written reprimands, and he alleges discriminatory termination.  Plaintiff clearly meets the first prong of his prima facie case, as he is a member of a protected class.  However, an examination of both of plaintiff's claims of discrimination demonstrates plaintiff's failure to lay out a prima facie case.

### (A)    Plaintiff's Claims Regarding Written Reprimands

First, plaintiff claims that Leiker discriminated against him by way of written reprimands.  However, "absent some tangible job consequence accompanying" such reprimands, they do not meet the definition of an adverse employment action.  *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir. 1998).  In this instance, plaintiff has

---

[11]In this instance, the Seventh Circuit has determined that pretext means a phony reason for the employer's actions.  *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999).

not alleged that these written reprimands led to any job consequence, let alone a tangible one.  Hence, plaintiff has failed to demonstrate a prima facie case of discrimination based on the written reprimands.

### (B)    Plaintiff's Claims Regarding Termination

As to plaintiff's discriminatory termination claim, clearly plaintiff's termination was an adverse employment action, so it is necessary to examine the second and fourth prongs of plaintiff's prima facie case.

The issue which must first be addressed requires reaching an analysis of the reasons articulated by the defendant for terminating the plaintiff.  In its brief, defendant argues that the decision to terminate plaintiff was as a result of the plaintiff's actions on a particular date – May 19, 2003.  Defendant alleges that plaintiff's "threatening, insubordinate or similarly inappropriate behavior in the workplace" (Defendant's Brief in Support, p. 10) was the primary reason for his termination.  However, in conjunction with his termination, plaintiff was given three written statements articulating "the reasons" for his termination.  These statements specifically state that plaintiff was terminated for the somewhat vague reason of "Unsatisfactory performance" ("New Termination Form," Leiker Depo. Exhibits; Schwan's "Service Letter" dated May 29, 2003, Exhibit GG) or "for performance" (Jim Wildman letter dated May 29, 2003, Exhibit FF) and do not reference any instance of violation of company policy, misconduct or insubordination.

Documents taken from defendant's personnel manuals and submitted by the plaintiff show that the "Reason Codes" which can explain defendant's disciplinary actions include a "Code 20" for "Misconduct," a "Code 44" for "Violation of company policy," and a "Code 46" for "Refusal to follow instructions (insubordination)."  Plaintiff argues that since the May 19, 2003 incident was the precipitating factor preceding discharge, a "Misconduct" or "Violation of company policy" or a "Refusal to follow instructions (insubordination)" most closely fit the defendant's purported reason for termination on May 23, 2003.

Plaintiff argues that if the May 19, 2003 incident was the reason for termination, then the letters of termination given to him should have reflected one of those three "codes," and not the code for "Unsatisfactory performance."  Plaintiff argues that the use of the "Unsatisfactory performance" in the letters is in conflict with the admitted facts that plaintiff met sales goals and other indicia of "performance" on his job.  Plaintiff argues that the inconsistency between the reasons for termination in the letters and plaintiff's performance of his sales goals create an inference that defendant was being dishonest in articulating the reasons for his discharge.

The importance in drawing the distinction between what reasons are given for termination is because of case law that addresses how the court analyzes the prima facie case of discrimination that the plaintiff must prove before his/her case survives summary judgment.  If plaintiff was terminated for "poor performance," he must bring in evidence that he was performing to his employer's legitimate

expectations.  However, if an employee is terminated for a one-time incident that involved other employees, an examination of whether the employee is performing his job satisfactorily is unnecessary.  *Curry v. Menard, Inc.,* 270 F.3d 473, 477-78 (7th Cir. 2001); *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir. 1999).  Instead, the analysis continues to the fourth prong of plaintiff's prima facie case to determine if similarly situated employees outside of plaintiff's protected class were treated more favorably.  *Curry,* 270 F.3d at 478.

    **(C)**    **Was plaintiff terminated for a single instance of misconduct occurring on May 19, 2003?**

In this case, if the court should conclude that plaintiff was terminated only for a single incident of conduct, the plaintiff could not make a prima facie claim of discrimination.  Plaintiff, in this case, alleges that both he and Kennedy were involved in the May 19, 2003 incident and that it was discriminatory for him to have been terminated when Kennedy was not.  However, in order to show that an employee treated differently (such as Kennedy) was, in fact, similarly situated, plaintiff must demonstrate that they were similarly situated in all respects including *dealing with the same supervisor.  Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 330 (7th Cir. 2000).  Here, plaintiff's supervisor, who ultimately decided to terminate him, was Leiker, while Kennedy's supervisor was Kirchhoff.  Because Kennedy and plaintiff had different supervisors, they simply were not similarly situated, and plaintiff has failed to demonstrate a prima facie case of discrimination.

**(D)    What if "poor performance" was the reason for termination?**

In this case, the Magistrate Judge concludes that it is most likely that the single incident of May 19, 2003, was intended to be the reason articulated by the defendant for termination.  Although there is a dispute about who started the incident, even the plaintiff agrees that on May 19th he "had words" with Kennedy and Kirchhoff and the argument became heated to the extent plaintiff was removed from the room.  The termination decision occurred on May 23rd – only four days afterwards.  These facts all point to a precipitating event for the plaintiff's discharge.  The fact that the letters do not specifically reference a particular "code" – in the context of the evidence as a whole – is not sufficient to create a genuine issue of fact about the reason the defendant intended to convey as its basis for termination.

On the other hand, and given the benefit of any inference to him, if the plaintiff was terminated in this case for "poor performance," the plaintiff has brought forward some evidence that he has attained the sales goals required of defendant.  The Magistrate Judge concludes if plaintiff was to be terminated for "poor performance," the evidence brought forward by the plaintiff would meet his burden to establish a prima facie case of discrimination, shifting the burden to the defendant to articulate a legitimate, nondiscriminatory reason for termination.

The defendant has done so, stating that "poor performance" or "unsatisfactory performance" – as is defined in the employee handbook – can encompass more than just the failure to attain sales goals.  Under the handbook,

- 22 -

an employee can perform poorly by becoming insubordinate, by fighting, by threatening, or interfering with other employees.  The handbook specifically states that some instances of misconduct can be so serious that standing alone they justify immediate discharge.

The defendant having articulated a legitimate, nondiscriminatory reason for termination, the burden then shifts to the plaintiff to show pretext.  As previously discussed, the fact that Kennedy – a white individual – was not discharged is not material because Kennedy was subject to discipline by a completely different supervisor.

The other facts referenced by plaintiff to establish pretext include:

(1)  that a remark was made prior to January 2002 by a different supervisor (Sinclair) about the fact that plaintiff was black and his wife was white;

(2)  that in the same time period (at least 18 months prior to his termination), the other supervisor (Sinclair) "pressured" him to return the name of the depot newsletter to the *Rebel Yell*;

(3)  that in early 2002 he was advised of (but did not personally hear) racist remarks by a manager (Hinrichs) who was later terminated for those remarks;

(4)  that after heated conversation (not having to do with race) with his supervisor, Gary Leiker, in September 2002, his supervisor placed the "Corrective Actions" in his personnel file, none of which related to insubordination, and some of which may have been unfounded;

(5)  that plaintiff was given an evaluation in February 2003 that indicated he was only "partially meeting expectations"; and

(6)  that a person involved in training (Luettejohann) told plaintiff's subordinates (but not plaintiff) that plaintiff did not know what he was doing, and that the Town of Highland residents "don't

put up with blacks being here past dark" and that "the Klan is huge here," and was not disciplined for saying those things after plaintiff complained.

The Magistrate Judge concludes that although these six pieces of evidence exist, they do not – taken singly or *together* – create genuine issues of material fact concerning the defendant's motives that are sufficient to establish that a decision to terminate plaintiff was pretext. Even accepting all six of these incidents as true, two incidents (1 and 2) involve a supervisor not a participant in the decision to terminate, and occurred at least 18 months before the decision was made. They are simply too far removed from the termination decision to be material. Two other incidents relate to comments made by others not in the plaintiff's presence (3 and 6) and were made by a person terminated for those comments well before the decision to fire plaintiff was made (Hinrichs) and by a trainer (Luettejohann) who had no supervisory authority over plaintiff and who did not participate in the decision to terminate. Of the remaining two incidents (4 and 5), the giving of an evaluation not particularly favorable is not sufficient to create doubt about pretext, and the dispute between plaintiff and Leiker in September 2002 is nine months before the termination incident and involved a dispute over "job duties" without a hint of racial overtone.

Therefore, the Magistrate Judge concludes that plaintiff has failed to bring forth sufficient evidence to show that the defendant's articulated decision is merely a pretext for discrimination.

As plaintiff has failed to demonstrate discrimination under § 1981, his claim must be **DISMISSED**.

**(b)     Plaintiff's Claim of Retaliation**

While § 1981 claims and Title VII claims are generally treated the same, there are important differences that are relevant to the court's analysis in this case.  The Seventh Circuit has determined that § 1981 "encompasses only racial discrimination on account of the plaintiff's race and does not include a prohibition against retaliation for opposing racial discrimination."  *Hart v. Transit Management of Racine, Inc.,* 426 F.3d 863, 866 (7th Cir. 2005).  In this instance, plaintiff argues that, after he made complaints of racial discrimination, defendant terminated him in retaliation for his raising of the complaints.  This claim alleging retaliation is not actionable under § 1981 and must be **DISMISSED.**

**V.   Conclusion**

Although the defendant may have been mistaken about what occurred in the incident of May 19, 2003, and although the court might have made a different decision if it was the defendant's personnel manager, the plaintiff has failed to produce sufficient facts to require a jury to decide the defendant's articulated reason for terminating him was merely a pretext for discrimination.  Therefore, defendant's Motion for Summary Judgment is **GRANTED.**  Plaintiff's claims are **DISMISSED, with prejudice.**

SO ORDERED.

**Dated:**  August 23, 2006

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

- 25 -

**<u>Electronic copies to</u>:**

Robert Peter Kondras Jr.
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net

Amy Suzanne Wilson
LOCKE REYNOLDS LLP
awilson@locke.com

Heather L. Wilson
LOCKE REYNOLDS LLP
hwilson@locke.com